STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

08-128


C. J. M.

VERSUS

C. L.


\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. C-2007-282
HONORABLE JOEL G. DAVIS, DISTRICT JUDGE
\*\*\*\*\*\*\*\*\*\*

GLENN B. GREMILLION
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Glenn B. Gremillion, and James T. Genovese, Judges.

**Cooks, J., concurs and assigns reasons.**


                                                    **REVERSED AND REMANDED.**


**E. David Deshotels**
**Deshotels, Mouser & Deshotels**
**P. O. Box 399**
**Oberlin, LA 70655**
**(337) 639-4309**
**Counsel for Plaintiff/Appellee:**
        **C. J. M.**

**Timothy M. Cassidy**
**Hon. Steve Gunnell**
**Cassidy & Gunnell**
**P.O. Box 1446**
**Jennings, LA 70546**
**(337) 824-7322**
**Counsel for Defendant/Appellant:**
     **C. L.**

GREMILLION, Judge.

In this case, the mother, C.L., appeals the judgment of the trial court naming the father, C.M., the primary domiciliary parent of the minor child, H.M. For the following reasons, we reverse and remand for proceedings consistent with this opinion.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

C.L. and C.M., who never married, are the parents of H.M., born in December 2003. At the time they were together, the family resided in Oberlin, Louisiana, along with C.L.'s older daughter from a previous relationship. The parents separated in April 2006, and C.M. moved to Crowley with both of her daughters. At that time, the parties extrajudicially agreed on a week-to-week custody arrangement. In May 2007, C.L. registered H.M. for school and advised C.M. that due to the start of school, H.M. would have to reside with her during the week, with three weekends out of the month being reserved for C.M., along with liberal holiday visitation and shared week-to-week visitation during the summer months.

On June 18, 2007, C.M. filed a Petition for Custody seeking to be named H.M.'s domiciliary parent, with C.L. having her daughter three weekends out of the month, liberal visitation, and week-to-week visitation in the summer. Following a hearing on the matter, the trial court, on September 27, 2007, awarded domiciliary custody to C.M. C.L. now appeals and assigns as error the trial court's:

1.    Failure to properly consider the factors enunciated in La.Civ.Code art. 134;

---

[1]Pursuant to Uniform Rules—Courts of Appeal, Rule 5-1, we use initials throughout to protect the minor's identity.

2. Placing too much emphasis upon the paternal grandparents; and;

3. By separating H.M. from her seven-year-old sister.

## LAW AND DISCUSSION

A trial court's determination of child custody is entitled to great weight on appeal and will not be disturbed absent a clear abuse of discretion. *AEB v. JBE*, 99-2668 (La. 11/30/99), 752 So.2d 756. When the trial court has made a considered decree of permanent custody, the petitioning party bears the difficult burden of proving that the continuation of the present custody situation is so deleterious to the child that it justifies a modification of the custody arrangement, or of proving by clear and convincing evidence that any harm likely to be caused by the change of environment is substantially outweighed by the advantages to the child. *Bergeron v. Bergeron*, 492 So.2d 1193 (La.1986). A considered decree is one in which evidence as to parental fitness has been received by the trial court. *Oliver v. Oliver*, 95-1026 (La.App. 3 Cir. 3/27/96), 671 So.2d 1081.

When a considered decree has not been rendered, but the parties have stipulated to an agreement without the court considering parental fitness, a lesser burden applies. In order to modify a custody arrangement, the movant must prove that 1) a material change in circumstances has occurred, and 2) that the new custody arrangement would be in the best interest of the child. *Id.*

In this case, the original custody arrangement was agreed upon extrajudicially, thus C.M. had to prove that a material change in circumstances occurred and that the new custody arrangement was in the child's best interest. At the conclusion of the trial, the trial court set forth a written opinion which stated, in

2

part:

> This case is a very close case for decision. . . . On the plus side, both parents are loving, fit parents whom I believe will take proper care of [H.M.].
>
>    . . . .
>
> While both parents are worthy, caring and loving for the child, the decision confronting the court is not who will be the best parent. The decision must be what is in the best interest for [H.M.].
>
> After much consideration, I have reached the decision that [H.M.] should live with the father, [C.M.], and he should be the custodial parent. I believe that [H.M.] should be with her mother a substantial amount of time.
>
> I will list the reasons for my decision:
>
> (1) [H.M.] has spent a lot of time in Oberlin and is well situated with her father and her grandparents, who live next door. The father is a hands-on parent, which I find somewhat unusual and desirable.
>
> (2) The court has reviewed and considered Article 134 and the cases which dealt with the article.
>
> (3) The court is aware that the parents, i.e. the father and mother, have paramount rights to raise their child and this is paramount to the rights of the grandparents. However, in the case of Krotoski vs. Krotoski, 454 So.2d 374, the trial court properly considered first that if primary physical custody was granted to mother in California, grandparents would be available to assist in caring for the child, whereas, the father in Baton Rouge could only provide a stranger to the child to assist him. While not identical, the situation here is similar. When [H.M.] gets home from school and the parents are at work, the grandmother and grandfather will be there to provide care, food and help with lessons.
>
> (4) While it is not the decisive factor in the case, the fact that the grandparents are well-educated and teachers, they will be helpful to the care and education of the child.
>
> (5) The court is also aware that both father and mother have only recently married and there will be a period of adjustment to the marriage by both parents. While the court is hopeful that both marriages will last and be successful, the court is also aware that many marriages in our

3

modern day are of short duration, especially when there was a short period of courtship.

(6) The fact that the relationships between the father and grandparents are very close, whereas the reverse is true between the mother and her parents. Accordingly, the court believes that [H.M.] should be with her father during the school week in Oberlin and with the mother at other times[.]

The witnesses testified at trial as follows:

C.M., who was twenty-five at the time of trial, testified that he had married the Saturday before the trial began. He described his relationship with C.L. and stated that when they first started dating, C.L.'s older daughter was being taken care of by C.L.'s father. C.M. testified that C.L. did not visit the older daughter for several months while they were dating, but that they began raising her when she was about three years old during the time that she was pregnant with H.M. C.M. further testified that his parents have always been very involved in H.M.'s upbringing. He stated that he now has a six-year-old step-daughter. C.M. further testified that his dad is the principal of the local school, and his mom is a retired school teacher. C.M. stated that H.M.'s life would be more stable in Oberlin and that she would be "looked after a lot."

C.M. testified that H.M. was close with his parents. He further testified that C.L.'s mother and step-father are "not the best people." He said that neither he nor C.L. maintained contact with C.L.'s mother, who also lives in Oberlin. He further said that C.L. does not speak to her father at all. C.M. went on to state that he regularly attends church. He stated that H.M. would have a family member available to pick her up after school.

4

C.M. testified that for two weeks he works from 7:00 a.m. to 7:00 p.m. and that for the other two weeks he works from 7:00 p.m. to 7:00 a.m. He stated that his wife works Monday through Friday from 7:00 a.m. to 4:00 p.m. C.M. testified that he had no concerns about the care C.L. provided to H.M.

F.M., C.M.'s mother, testified that she has always had a close relationship with not only H.M. but C.L. as well. She testified that when C.M. and C.L. were together they would eat at her house every day. She stated that C.M. was purchasing the house he lived in from her and her husband. F.M. stated that C.M. is a good mother and had provided for all of H.M.'s needs, but she believed that H.M.'s life would be more stable in Oberlin.

T.B.M., C.M.'s wife, testified that she and C.M. dated for about six months before marrying the previous Saturday. She testified as to her affection for H.M. and described C.M. as a "hands-on" parent.

R.M., C.M.'s dad, testified that he is the principal of the local elementary school. He stated that he has always had a good relationship with C.L.

C.L. testified that she was eighteen when she had her first daughter. She testified that for a period of about six months her mother kept her older daughter while she worked the graveyard shift at a casino. She stated that after she and C.M. got together, her older daughter came to live with her when she was about three years old and when she was pregnant with H.M. C.L. stated that she has always had a good relationship with C.M.'s parents. She further testified that she re-arranged the custody schedule so that H.M. could spend more time with her grandparents during a period of time when F.M. was undergoing treatment for cancer.

5

C.L. testified that her older daughter maintains a 3.7 or 3.8 GPA. She stated that H.M. would attend the same school as her older daughter and that she would drop them off in the mornings. She said the school was about three blocks from her home. C.L. further testified that she recently married (coincidentally on the same day as C.M.) and that her husband has worked for a drilling company for over six years.

C.L. testified that H.M. has a very close relationship with her older daughter. She further stated that H.M. is registered for classes for her First Communion. C.L. testified that although her relationship with her parents is strained, she has plenty of supportive family and friends around her including her grandmother, uncle, and cousins. C.L. was very clear that she believed C.M. was a good father and that H.M. had a very strong relationship with her grandparents, which she fully supported. She stated that even after she and C.M. split up, she continued to have a close relationship with his parents. C.L. testified that she works 8:00 a.m. to 4:30 p.m., Monday through Friday.

C.G.L., C.L.'s twin sister, testified that she and C.L. are very close and spend time together doing family activities. S.S., C.L.'s brother, testified to the same. A.B., C.L.'s supervisor at work for the previous year and a half, testified that she does a very good job and that she was impressed with her performance. She testified that she usually arrives at work early and works a full day until 4:30 p.m.

Having reviewed the testimony and the law, we find that the trial court abused its discretion by placing primary emphasis on the grandparents involvement in the child's life. The trial court did not discuss any of the factors in Article 134, yet

6

four of its six reasons for awarding domiciliary custody to the father were based on his parents. Although the trial court found both parents to be fit and able to meet H.M.'s needs, it relied heavily upon the relationship H.M. has with her paternal grandparents—a relationship that has been fostered and encouraged by the mother, while ignoring other facts, such as the parents' work schedules and H.M.'s relationship with her half-sister, which should have been a primary consideration in its determination.

Moreover, we find the case relied upon by the trial court, *Krotoski v. Krotoski,* 454 So.2d 374 (La.App. 4 Cir. 1984), to be inapplicable to the case at hand. In *Krotoski*, both parents were highly educated professionals who were originally from California. The parents shared joint custody with their daughter residing with the mother and the father having liberal visitation. Upon receiving her PhD, the mother applied for, but was unable to find a job in Louisiana, however she was offered a position in Irvine, California. Both sets of grandparents resided in Irvine, whereas they had no family residing in Louisiana. The appellate court, in affirming the trial court's placement of the child with the mother during the school year, found, "There are only two major differences involved in the proposed environments. In Irvine the child would have the benefits of an extended family as both sets of grandparents and other collaterals are located there." *Id.* at 376. The father had no family close-by and would have had to rely on a neighbor to assist in the child care. Additionally, the court found that a young girl approaching puberty would benefit from residing with the same-sex parent.

7

It is clear from our review of the record, that C.L. has always encouraged the close relationship H.M. maintains with her grandparents. It seems ironic that those actions would be used against her in determining the best interests of her child. While the trial court should consider the role the grandparents will play in the rearing of their grandchild and assistance they provide to the parent, we find the trial court placed an inordinate amount of weight on the paternal grandparents' role in this case. This is especially true when considered in the light of C.M.'s work schedule. Basically, on the days he works the 7:00 a.m. to 7:00 p.m. shift, H.M. will be cared for by the grandparents or a step-parent. C.L.'s work schedule was not considered and is more conducive to her raising a child.

While we are constrained to yield to the trial court's discretion in cases such as these, we feel in this instance that because the trial court placed an inordinate amount of weight on the paternal grandparents' role without weighing the other factors of Article 134, the matter should be remanded to the trial court with instructions that it consider all of the pertinent factors before deciding the best interest of the child. We do not in any way suggest any finding by the trial court and leave the final determination to the trial court's vast discretion. Accordingly, we remand this case to the trial court to determine the best interests of the child based on the factors set forth in La.Civ.Code art. 134.

## CONCLUSION

The judgment of the trial court awarding domiciliary custody to C.M. is hereby reversed. The trial court is instructed to proceed in accordance with this opinion. Costs of this appeal are assessed equally between the parties.

**REVERSED AND REMANDED**.

8

**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**08-128**


**C. J. M.**

**VERSUS**

**C.  L.**


**COOKS, J., concurs.**

I find the record, as it stands, sufficiently and persuasively speaks in favor of maintaining primary domiciliary custody with the mother.