535 So.2d 842 (1988)
John Moss CHRISTIAN, Plaintiff-Appellee,
v.
Carole Echols CHRISTIAN, Defendant-Appellant.
Nos. 19835-CA, 19836-CA.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1988.
*843 Barham, Adkins & Tatum by T.J. Adkins, Ruston, for defendant-appellant.
Lancaster, Baxter & Lancaster by Michael E. Lancaster, Tallulah, for plaintiff-appellee.
Before JASPER E. JONES, FRED W. JONES, Jr. and SEXTON, JJ.
SEXTON, Judge.
Defendant-appellant, Carole Echols Christian, appeals the judgment granting her and her husband "joint custody" of their four-year-old son, John Moss Christian, with primary residential care granted to her husband, John Moss Christian, subject to certain visitation rights by Carole Echols Christian. Determining that the trial court award is a joint custody award in name only, we modify that award and render.

FACTS
John Moss Christian and Carole Echols Christian were married on April 8, 1983. The couple had one child, Joshua Christian, who was born on June 30, 1984. The parties separated numerous times during the marriage and finally separated permanantly in April 1986. Mr. Christian subsequently filed for separation and provisional custody of the then two and one-half-year-old child. Ms. Christian filed a reconventional demand for separation based upon cruel treatment by her husband in addition to a request for custody of the child. The trial court granted the separation and awarded provisional sole custody to the father. Ms. Christian applied to this court for supervisory *844 review of that judgment which was denied.
Mr. Christian petitioned for divorce on June 23, 1986 and requested permanent custody of the child. The trial judge granted John Moss Christian a divorce based upon the grounds of adultery and awarded joint custody of Joshua to the parties with primary domiciliary custody granted to the father and visitation given to the mother every other weekend and one week of each month during the summer plus alternating holidays. It is from this custody decree that Ms. Carole Echols Christian appeals.
Ms. Christian argues numerous assignments of error relating to the custody decree. She argues that the trial judge erred in failing to allow another district judge hear a motion to recuse and, in addition, in failing to grant said motion to recuse. She further argues that the trial judge improperly heard the case at hand as it was improperly assigned to Division "B" in direct violation of the Sixth Judicial District rules of court. She urges that the trial court erred in appointing certain mental health professionals to evaluate the parties, their parents, the minor child and the homes of the parties on its own motion. Finally, appellant asserts that the trial court erred in granting joint custody of the minor child as it is in reality a sole custody decree to the father with only minimal visitation rights to the mother.

MOTION TO RECUSE ASSIGNMENTS OF ERROR NOS. 1 and 2
By these assignments of error, the appellant argues that the trial judge erred in failing to allow another district judge of the Sixth Judicial District Court to hear a motion to recuse pursuant to Louisiana Code of Civil Procedure Article 151, subd. A(6) and also in failing to grant the motion to recuse under LSA-C.C.P. Art. 151, subd. A(6).
The record shows that the cause was tried on July 10, 1986 and taken under advisement. Thereafter, on August 21, 1986, the court, on its own motion, ordered the Department of Health and Human Resources to do a suitability study of the homes. As a result, two mental health professionals conducted the study of the homes. Subsequently, on September 22, 1986, the court, again on its own motion, appointed a psychiatric social worker to evaluate the child, both parents and their parents.
Counsel for defendant-appellant agreed to these appointments with the understanding that he would be allowed a hearing to cross-examine the professionals. Prior thereto, on February 18, 1987, the trial court, having received the reports of those having been appointed to conduct the examinations, simultaneously dispatched two letters to counsel for each party.
One of these letters simply set the case for a hearing on the reports of the appointed professionals on April 14, 1987. However, the other letter, which forms the basis for the motion to recuse, directed counsel for plaintiff-appellee to prepare a judgment in the form of the one which was eventually rendered in this cause. Thus, counsel for defendant-appellant asserted the trial judge should be recused because she had prejudged the case on the basis of the reports submitted without having heard the cross-examination.
LSA-C.C.P. Art. 151 sets forth specific grounds for recusal of a judge as follows:
Art. 151. Grounds
A. A judge of any court, trial or appellate, may be recused when he:
(1) Is a material witness in the cause;
(2) Has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter's employment in the cause;
(3) At the time of the hearing of any contested issue in the cause, has continued to employ, to represent him personally, the attorney actually handling the cause (not just a member of that attorney's firm), and in this case the employment shall be disclosed to each party in the cause;
(4) Has performed a judicial act in the cause in another court;
(5) Is the spouse of a party, or of an attorney employed in the cause; or is *845 related to a party, or to the spouse of a party, within the fourth degree, or is related to an attorney employed in the cause; or to the spouse of the attorney, within the second degree; or
(6) Is biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys to such an extent that he would be unable to conduct fair and impartial proceedings.
B. In any cause in which the state, or a political subdivision thereof, or a religious body or corporation is interested, the fact that the judge is a citizen of the state or a resident of the political subdivision, or pays taxes thereto, or is a member of the religious body or corporation, is not a ground for recusation.
This list of grounds for recusation is exclusive rather than illustrative. State v. Pailet, 246 La. 483, 165 So.2d 294 (1964); State v. LaBorde, 214 La. 644, 38 So.2d 371 (1949); State v. Davis, 154 La. 928, 98 So. 422 (1923); Spangenberg v. Yale Materials Handling-Louisiana, 407 So.2d 1270 (La. App. 4th Cir.1981), writ denied, 412 So.2d 1096 (La.1982); Bergeron v. Illinois Central Gulf Railroad Company, 402 So.2d 184 (La.App. 1st Cir.1981), writ denied, 404 So.2d 1260 (La.1981); Southern Builders, Inc. v. Carla Charcoal, Inc., 357 So.2d 638 (La.App. 3rd Cir.1978).
In Southern Builders, Inc. v. Carla Charcoal, Inc., supra, the Third Circuit addressed a similar situation. The trial judge in that case wrote a letter to counsel during a recess in the litigation which indicated that after several conferences with the court-appointed expert, the trial court felt that liability in the case should be allocated in a certain fashion.
A hearing on the motion to recuse was held before an ad hoc judge. The trial judge specifically testified that he still had an open mind in the case and could still fairly judge the matter. The trial judge further testified that he understood from counsel of one of the parties that the possibility of a settlement was in the offing and the letter was written to facilitate any possible settlement.
Two Third Circuit judges of the Southern Builders, Inc. v. Carla Charcoal court, citing much of the jurisprudence cited here, determined that that jurisprudence required that there be a specific statutory basis for recusing a judge and agreed that the trial court properly rejected the motion to recuse. The majority did not base its conclusion on the fact that the trial judge testified at the recusal hearing that the letter represented only tentative conclusions. While the majority opinion felt the trial judge could render a fair decision, the opinion noted the appearance of impropriety was a cause for serious concern and should have been the basis for recusation. However, the appellate court declined to overrule the trial court because of the long-standing rigid jurisprudence that the grounds for recusation must fall within one of the specifically enumerated provisions of LSA-C.C.P. Art. 151.[*]
Likewise, we are constrained to follow the uniform jurisprudence which holds that grounds for recusation are to be strictly construed. Like the majority in Southern Builders, Inc. v. Carla Charcoal, we are concerned with the appearance of impropriety but believe that we are bound by the long-standing interpretations of our Supreme Court.
Also in this assignment, appellant argues that the trial judge erred in failing to allow another district judge of the Sixth Judicial Court to hear the motion to recuse. LSA-C.C.P. Art. 154 provides that "[i]f a valid ground for recusation is set forth in the motion, the judge shall either recuse himself, or refer the motion to another judge or judge ad hoc...." The article therefore specifically indicates that if a valid ground for recusation does not exist, then the trial judge who is the subject of the motion to recuse can validly deny the motion without referring it to another judge. Inherent in our determination that *846 the present motion did not set forth a valid ground for recusation is the conclusion that the trial judge was not in error in denying the motion to recuse without referring it to another judge. This assignment of error lacks merit.

CASE ASSIGNMENT ASSIGNMENT OF ERROR NO. 3
In this assignment, defendant-appellant argues that the case was improperly assigned to Division B in direct violation of Rule 6 of the rules of the Sixth Judicial District Court. Thus, appellant urges that the trial court erred in denying the motion to transfer the case to the proper division.
The testimony presented at the hearing on the motion to transfer the case reveals that the case was assigned an odd number by the clerk of court. According to Rule 6 of the Sixth Judicial District Court, odd numbered cases are to be assigned to Division A, Judge Brackin presiding. However, the first rule (for provisional custody) was mistakenly heard before Judge Ragland of Division B. Nevertheless, after the provisional custody hearing in Division B, Judge Brackin of Division A set rules for provisional custody and alimony for Division A. Judge Brackin was then approached by counsel for plaintiff-appellee who questioned the fact that the provisional custody had already been determined before Judge Ragland. Judge Brackin informed this counsel that since the case was heard originally in Division B, that it should remain there. After conversations with both Judge Brackin and Judge Ragland, counsel for plaintiff-appellee filed a motion upsetting the original setting by Judge Brackin for the counterrules and reset them for a different date at which Judge Ragland could preside.
Judge Ragland overruled the motion to transfer the case to Division A based upon a conversation that she had with Judge Brackin of Division A (the only other judge in the Sixth Judicial District Court). She noted for the record that they agreed the case should continue to be heard in Division B and ruled that this action amounted to an en banc reassignment of the case in accord with the rules of the Sixth Judicial District Court.
We agree Judge Brackin and Judge Ragland consulted on the matter and determined that the case should remain before Division B. As there are only two judges in the Sixth Judicial District Court, this agreement between them constitutes an en banc reassignment of the case at hand. Appellant's assignment in this regard, therefore, lacks merit.

APPOINTMENT OF MENTAL HEALTH PROFESSIONALS ASSIGNMENT OF ERROR NO. 4
Defendant-appellant argues in this assignment that the trial court erred in appointing, on its own motion, mental health professionals to evaluate the parties, their parents and the minor child on two separate occasions. Counsel argues that the trial court violated Article 146 of the Louisiana Civil Code.
LSA-C.C. Art. 146 C(3) reads as follows:
(3) For the purpose of assisting the court in making a determination whether an award of joint custody is appropriate, the court may direct that an investigation be conducted.
In interpreting this article, the Supreme Court in Turner v. Turner, 455 So.2d 1374 (La.1984), noted that the court in furtherance of its obligations may order an investigation into the home lives of the parties, the psychological health of the child or any other factor which the judge deems to be important in his determination of the child's best interest.
Clearly, therefore, the trial judge in the instant case felt that in order to promote the best interest of the child, an investigation of the home lives of the parties was necessary. We have no doubt that LSA-C. C.Art. 146 C(3) and the interpretive jurisprudence render such authority to the trial court.

CUSTODY ASSIGNMENT OF ERROR NO. 5
Defendant-appellant argues in this final assignment that the trial court erred in granting joint custody of the minor child to the parties with Mr. Christian having primary *847 residential care and Ms. Christian only minimal visitation. Encompassed within this argument is an assertion that the custody decree, although termed "joint custody," is in actuality a sole custody decree.
LSA-C.C. Art. 146 provides that custody shall be awarded according to the best interest of the child with an award of joint custody having first preference. The article establishes a rebuttable presumption that joint custody is in the best interest of the child. Joint custody means that "the parties shall share the physical custody of children" and provides that the physical care and custody shall be shared by the parents in such a way as to assure a child a frequent and continuing contact with both parents. LSA-C.C. Art. 146, Hickman v. Hickman, 459 So.2d 140 (La.App. 2d Cir 1984).
However, when the court finds that a decree of joint custody is in the best interest of the child, it does not necessarily require an equal sharing of physical custody. All that is mandated by the legislative scheme is a substantial equality of time. Peters v. Peters, 449 So.2d 1372 (La.App. 2d Cir.1984); Adams v. Adams, 441 So.2d 490 (La.App. 2d Cir.1983); Plemer v. Plemer, 436 So.2d 1348 (La.App. 4th Cir.1983); Hickman v. Hickman, supra.
Every child custody case must be viewed within its own peculiar set of facts and the relationships involved with the paramount goal of reaching a decision which is in the best interest of the child. In all cases involving a child custody judgment, great weight is given to the trial court's decision which will not be overturned in the absence of a clear abuse of the trial court's much discretion. Stephenson v. Stephenson, 404 So.2d 963 (La.1981); Cleeton v. Cleeton, 383 So.2d 1231 (La.1980); Peters v. Peters, supra; Adams v. Adams, supra; Plemer v. Plemer, supra.
The custody decree in this case tracks the language of the provisional custody decree. In the final decree, however, the terminology was changed to state "joint custody" with the same provisions included.
This court on several occasions has reviewed the issue of whether or not so called joint custody decrees awarding domiciliary care of the child to one parent with minimal visitation rights given to the other were in fact meaningful joint custody plans within the meaning of LSA-C.C. Art. 146. Carroway v. Carroway, 441 So.2d 494 (La. App. 2d Cir.1983); Foy v. Foy, 505 So.2d 850 (La.App. 2d Cir.1987); Adams v. Adams, supra. In each of these cases, one parent was awarded domiciliary custody of the child or children with the other parent having only minimal visitation rights. In all three instances this court found that the decrees, although phrased in terms of joint custody, were no more than sole custody awards to the domiciliary parent as the judgments denied the non-domiciliary parent frequent and continuing physical contact with the child in contravention of LSA-C.C. Art. 146.
In the instant case, as in the above-cited jurisprudence, we find that the custody decree is in reality one which grants sole custody of Joshua to his father, John Moss Christian. The award in question denies the mother frequent and continuing physical contact with Joshua including the summer months, and we therefore determine it to be nothing more than a sole custody decree.
The conclusion that the decree at issue is in fact a sole custody decree directs us to a determination of whether or not the award of sole custody of Joshua Christian to his father, John Moss Christian, is in the best interest of the child. After a review of the evidence in this case, we determine that the custody decree is not.
Both parties presented evidence relating to the lifestyles of the couple during the marriage. The parties were very young at the time of the marriage and separated numerous times. The couple lived in Tallulah initially then moved to Ruston, Lake Providence, and back to Tallulah during the three years of marriage. Both parties held numerous jobs and both made numerous attempts at attending school. Ms. Christian *848 admitted to having five different jobs during the marriage, all of very short duration. Mr. Christian obtained employment with his father's pest control business when the couple were first married, but when they moved to Ruston he was forced to obtain employment there. He was laid off of his first job in Ruston, but obtained employment elsewhere during the couple's three-month stay there. The couple then moved to Lake Providence where John Moss opened a branch office of his father's business during the five-month stay. During this time, Carole attended Northeast Louisiana University. However, the parties soon separated and then reunited. They eventually returned to Tallulah to live with John Moss's parents before finally separating.
Joshua was born fourteen months after the couple's marriage. Both parties admitted that John Moss's mother took care of the child during the day when the couple lived in Tallulah and in Lake Providence. When they moved to Ruston, Carole's mother took care of the child for a while after which time a babysitter was employed during the day.
John Moss testified that he now lives with his parents in Tallulah and works for his father in his pest control business. He testified that he works from 8:15 in the morning to approximately 5:00 in the evening but is in and out of the house during that time. There is an indication in the record that Joshua is sent to a day care center twice a week although John Moss did not testify as to that fact.
John Moss admitted to striking Carole on one occasion causing her to experience a black eye. He testified that she, however, took part in the altercation and hit him on this occasion as well. He likewise admitted to locking her out of the couple's apartment after a fight, but stated that he let her in after a few minutes. Finally, the records contain an indication that John Moss's father has a drinking problem. John Moss, as well as his father and mother, deny this allegation and note that his father has come into the home "not sober" but that this happens very rarely. He admitted that he thought that Carole loved Joshua and was a good mother.
Carole Echols Christian likewise resides with her parents in Ruston while attending school to become a licensed practical nurse. She is obtaining very satisfactory grades and enjoys her schooling. She admitted that while the couple were married, John Moss's mother took care of the child while the couple was at work and that she usually took the child to church. Ms. Christian admitted to having two affairs with different individuals while the couple was separated for the last time. She expressed concern over what she thought to be a drinking problem of John's father. She claims that he arrived at the residence drunk on numerous occasions. She admitted that she thought that John Moss loved Joshua and had no doubt that he was capable of being a good father.
Additionally, testimony of mental health professionals was presented. Ms. Patricia Meriwether, a psychiatric social worker, felt that Joshua's interest would best be served if he were allowed to remain with his father in light of the child's age and the number of times that the parents moved throughout his life. She noted a strong tie between Joshua and his paternal grandmother and felt that this relationship should not be disrupted. The father in this case, she noted, also spent more time with the child but admitted that this was a result of the custody arrangement. She was not aware, however, that the child was attending day school while residing with his father. Ms. Meriwether felt that the mother did not present as stable an environment for the child as she was somewhat dependent on her parents and was still in school. She did note that Ms. Christian appears to have resolved some of her depression and is goal oriented in her lifestyle, but in her opinion had not reached that goal as of yet. She opined that it would seem reasonable to allow Ms. Christian more equal time with the child during the summer months should her schedule permit.
Ann Keene, a human service worker employed by the Department of Health and *849 Human Resources, conducted a home study of the home of John Moss Christian. She made no recommendations as to which parent was best suited to have domiciliary custody of Joshua and merely observed the home of the Christians. She noted that John Moss had sufficient financial backing to provide for the child and felt that the Christian home was entirely adequate for the child. She noted that John Moss was emotionally stable and in good physical condition. She determined that John Moss was well able to provide for the child's needs and was capable of providing a secure, stable and consistent surrounding for the child. She noted that the Christians had nothing derogatory to say about the Echols and did not note any problems with regard to the day care situation of the child while noting that it may promote good results for the child.
Nancy Brumfield, a human service worker, conducted a home study of the Echols household. She found the home to be very attractive and did not see anything that would prevent the child from being well taken care of. She spoke with Ms. Sue Walker, one of Carole's instructors, who noted that Carole was doing quite well in school. Ms. Brumfield found no evidence in her study of Carole Echols Christian's homelife which would lead her to believe that Ms. Christian should not have custody of Joshua.
Finally, the testimony of Sharon Taylor, a clinical social worker, revealed that she spent an hour and a half with Carole Christian. She noted that Ms. Christian was an adequate parent and found no reason why she should not have equal custody of Joshua. She was aware of Ms. Christian's activities after her separation and felt that they were due to depression. She noted that the distance between the two residences presented some logistical problems.
In concluding that the plaintiff, John Moss Christian, should have custody of Joshua, the trial court seemed to attach great importance to the conclusions of Patricia Meriwether who opined that the best interest of the child would best be served by granting primary residential custody of Joshua to his father. Thus, the court placed a great deal of emphasis on the importance of the paternal grandmother in this case. Although the trial judge is given wide discretion in making child custody judgments, we cannot determine that the best interest of Joshua supports the judgment rendered in this case.
While not actually an award to the grandmother, the trial court's judgment is tantamount to a conclusion that Joshua's best interest is served by his having day-to-day needs met by his paternal grandmother.
The experts testified to the importance of the mother's influence in the child's life and admitted that the relationship that has been fostered between the child and his grandmother and father is due to the present custody situation which all but excludes the mother's influence on the child's life.
Although Joshua's well being is served by allowing his grandmother to be a part of his life, her influence should not take the place of his mother's, particularly in the light of the child's young age.
Another factor of importance in the trial court's determination was the behavior of Ms. Christian during the party's separation. We cannot, however, determine that these isolated instances affected the well being of Joshua as they took place while Joshua was out of the custody of his mother. An expert testified that these activities were attributed to depression due to the loss of custody of the child. The evidence reveals, and the trial court noted, that Ms. Christian has settled down and is improving her life.
Clearly, therefore, both parties are capable of giving Joshua adequate love and affection and each acknowledge this quality in the other. Additionally, the testimony reveals that both households are adequate to provide Joshua with sufficient care.
The evidence, therefore, fails to rebut the presumption that joint custody is in the best interest of the child. Thus, the trial court award, being tantamount to an award of sole custody, is in error. This *850 child of preschool years needs and should have more regular contact with his mother. Accordingly, we will grant equal custody of Joshua to both parties for a period of six months at a time from the date of this judgment with the party who does not have domiciliary custody enjoying visitation every other weekend. Because Ms. Christian has had significantly less contact with the child since these proceedings began than has Mr. Christian, her six month period will begin with the finality of this judgment. After six month's time, she will relinquish the domiciliary care of Joshua to Mr. Christian for six months, and so on, until the child begins school. Ms. Christian will likewise be allowed visitation every other weekend when Mr. Christian is the domiciliary parent. We will hereinafter establish a holiday schedule.
As we appreciate it, the child will begin school in the fall of 1989. At that time, the parties will hopefully agree to and submit to the trial court a plan of implementation of joint custody consistent with the child's school schedule and the schedule of the parties.
Finally, the trial court in this case failed to award child support to defendant-appellant, Carole Echols Christian, during the time that she has custody of Joshua. The record reveals that Ms. Christian has returned to school, but is not responsible for tuition. Although she was employed at the time of the filing of her affidavit of expenses, she is now unemployed and lives with her parents full-time. In her expense affidavit, Ms. Christian itemizes specifically $452 per month for the child alone, such as educational expenses, clothing and nursery school.
John Moss Christian works in his father's pest control business and lives with his parents. He testified that his average monthly income is about $1,000 a month. However, this fluctuates depending upon how well the business does during different seasons of the year. He additionally testified that some months he does not receive any salary and allows the money to cover expenses he and Joshua incur while living at home. Mr. Christian estimates that his expenses total $844 per month without separating his estimation of expenses associated with Joshua.
Although the financial situation of both parties is meager, Mr. Christian is in a better financial position to help defray the cost of taking care of Joshua while he is in the custody of his mother. We will therefore require that Mr. Christian pay child support during the period Joshua is domiciled with his mother in the amount of $250 per month.

DECREE
IT IS ORDERED, ADJUDGED AND DECREED that Carole Echols Christian and John Moss Christian are awarded joint custody of their minor child, Joshua Christian, with each party having equal custody of said minor from the date of this judgment on a rotating basis until the child begins school in the fall of 1989. Ms. Carole Echols Christian will have custody of Joshua for six months from the date of this judgment with Mr. Christian having visitation rights every other weekend from 4:30 Friday afternoon until 4:30 on Sunday afternoon. Upon the termination of this six month period, John Moss Christian will have custody of Joshua with Ms. Christian having visitation rights every other weekend. These alternating six month periods will continue until the child begins school in the fall of 1989, or thereafter, if for some reason the child is not enrolled in school at that time. During the aforesaid periods of visitation, Mr. Christian will have visitation with the child on Thanksgiving of 1988 and is to be allowed to observe some Christmas function with the child either on Christmas Eve 1988 or Christmas Day 1988 in accordance with the determination of the parties. Ms. Christian will have visitation with the child on Easter Day 1989. Upon the child entering school, the parties are directed to attempt to fashion an agreed upon plan of joint custody; failing which, of course, either may resort to judicial process.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of defendant-appellant, Carole Echols Christian, and *851 against plaintiff-appellee, John Moss Christian, condemning John Moss Christian to pay to Carole Echols Christian the sum of Two Hundred Fifty and No/100 Dollars ($250) per month for maintenance and support of the minor child, Joshua, during the months in which Carole Echols Christian has custody.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all costs are assessed against plaintiff-appellee, John Moss Christian.
AMENDED AND RENDERED.
NOTES
[*] Interestingly, the concurrence expressing concern over the appearance of impropriety was the majority view of the panel. Only the author subscribed to the opinion as written, which was at least in part based on the trial judge's testimony that his conclusions were only tentative.